MONARCH INSURANCE COMPANY OF OHIO, Appellant,

v.

May SPACH, as Receiver for Ro-Ben, Inc., Appellee.

No. 17889.

United States Court of Appeals
Fifth Circuit.

July 8, 1960.

Rehearing Denied Aug. 5, 1960.

Geo. J. Baya, Miami, Fla., for appellant.

Stephen C. McAliley, James A. Smith, Wicker & Smith, Miami, Fla., for appellee.

Before TUTTLE, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

In what would otherwise be an ordinary run-of-the-mill diversity suit granting recovery under a fire insurance policy for property located in Florida, there is presented an issue on a specific piece of evidence tendered and excluded which brings the question to the brink of the constitution. The precise question is whether a federal court sitting in Florida could, by virtue of a specific Florida statute, exclude testimony which otherwise would be admissible.

Posing the problem with such potential implications is a very simple situation. The property owner, a Florida corporation, sued the insurance company. It removed the case to the Florida District Court on diversity. Among many defenses filed to the complaint were those charging specifically that the assured had wilfully made false and fraudulent representations with respect to the origin and cause of the fire which was in truth of incendiary origin, the value of property before the fire and the damage sustained, and actions of the president of the assured corporation just prior to the fire. Further, it alleged a wilful concealment of specific facts covering similar matters, intentional false swearing in the formal proof of loss and intentional false swearing with respect to specified similar matters in the examination under oath obtained after the loss. These and other specific defenses raised squarely the question of honesty and fair dealing on the part of the corporate assured through its president in connection with the issuance of the policy and the actions taken after the loss in the assertion of the claim under the policy. Credibility of the corporate president was a key matter in general. In addition false statements made in the prosecution of the claim could amount to an outright defense as a breach of the contract. American Ins. Co. of Newark, N. J. v. Robinson, 1935, 120 Fla. 674, 163 So. 17; Chaachou v. American Central Ins. Co., 5 Cir., 1957, 241 F.2d 889.

Acting pursuant to provisions of the policy the Insurer examined the corporate president under oath prior to the commencement of any legal proceedings. This was done before a court reporter, privately employed. The Insurer's answer set up that in this examination on oath the president had falsely sworn to significant specified facts. During cross examination of this witness on the trial, the Insurer defendant undertook to cross examine the president on the basis of this statement which had been taken. The plaintiff objected on the ground that the Insurer had declined to furnish a copy pursuant to the demand made by the Assured both at the time of its taking and thereafter by formal letter to counsel for the insurance company. Consequently, the plaintiff urged the statement should be excluded under a 1951 Florida Statute providing that on refusal to honor a demand for a copy "no written statement by an injured person shall be admissible in evidence or otherwise used in any manner in any civil action relating to the subject matter thereof * *." [1]

The Court sustained the objection and forbade the use of this statement either for purposes of impeachment or to establish the affirmative defenses of false swearing.

On this record we are certain of four things. First, there was an adequate proffer. Second, the trial court after extended argument fully understood the respective position of both parties, and the Court's ruling intentionally prohibited any use of the statement. Third, the evidence was such that in the context of this contentious controversy, it was important and relevant for both impeachment purposes and to establish the affirmative defense of breach of the policy. It bore directly and critically on the merits of the case and unless the District Court was justified in excluding it by virtue of the Florida Statute, the cause must be reversed. Fourth, we accept the plain words of the Florida Statute as making it applicable to cover this kind of a statement concerning destruction of property made in connection with a contract, not tort, claim.

The fact that rules of evidence are ordinarily thought of as procedural or, for that matter, are covered at least in part by specific Federal Rules of Civil Procedure does not really solve the problem. For we are taught that while the lines are shadowy and we may but dimly see the path, the Erie [Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188] adjustment which our constitutional federalism imposes on a federal court hearing a diversity case is not satisfied by a talismanic label of "procedural" or "substantive." But this is not, as some have occasionally felt or uttered, to say that in diversity cases substance and procedure are now one and the same thing or that, as one dissenting Justice characterized it, the Supreme "Court riddled the distinction between 'substantive' and 'procedural'." Wells v. Simonds Abrasive Co., 1952, 345 U.S.

1. § 92.33, Florida Statutes 1959, F.S.A.
    "Every person who shall take a written statement by any injured person with respect to any accident or with respect to any injury to person or property shall, at the time of taking such statement, furnish to the person making such statement a true and complete copy thereof. Any person having taken, or having possession of any written statement or a copy of such statement, by any injured person with respect to any accident or with respect to any injury to person or property shall, at the request of the person who made such statement or his personal representative, furnish the person who made such statement or his personal representative a true and complete copy thereof. No written statement by an injured person shall be admissible in evidence or otherwise used in any manner in any civil action relating to the subject matter thereof unless it shall be made to appear that a true and complete copy thereof was furnished to the person making such statement at the time of the making thereof, or, if it shall be made to appear that thereafter a person having possession of such statement refused, upon request of the person who made the statement or his personal representatives to furnish him a true and complete copy thereof."

514, at page 523, 73 S.Ct. 856, at page 861, 97 L.Ed. 1211, at page 1219 (dissenting opinion).

■■ The terms are still useful and when the thing sought to be determined is analyzed in the light of the goal of achieving substantial uniformity in decision in a state court and a federal court sitting within that state concerning a state-created right, they can be decisive. Their use in the accommodation of adjudication by federal courts to those of the forum state grows out of analogies in the field of conflicts of laws and the historic experience under the Rules of Decision Act [2] and the Conformity Act.[3] If it is "substantive" in the analogous conflicts of laws sense, then the federal court must follow that of the forum state. And in determining what that substantive law is, Erie accorded equal significance to decisional as well as statutory declaration. On the other hand, the procedural rules to be followed are those of the court hearing the cause. After a series of cases demonstrated that substantial uniformity in result could or would often be thwarted or deterred from the impact of rules or practices customarily characterized as procedural, the court recognized that in this profound realm of federalism there were some procedural rules which so far affect rights and the outcome of the case as to require that they be followed by the federal court. This resulted in the "outcome-determinative" test. "In essence, the intent of that decision [Erie] was to insure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a state court. The nub of the policy that underlines Erie * * * is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a state court a block away should not lead to a substantially different result." Guaranty Trust Co. of New York v. York, 1945, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079, 2086.

The implications of such an approach, exemplified in action as it was in at least two cases where specific Federal Rules of Civil Procedure were given a subordinate role to state requirements in the same area,[4] can be somewhat awesome. Even

---

**2.** The statute formerly provided that "The laws of the several states, except where the Constitution, treaties, or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the courts of the United States, in cases where they apply." Rev.Stat. § 721 (1878). As recently amended, the statute is now applicable to "civil actions" generally. 28 U.S.C.A. § 1652 (1950).

**3.** Section 5 of the Conformity Act of 1872, dealing with methods of instituting and carrying on litigation provided: "The practice, pleadings, and forms and modes of proceeding in other than equity and admiralty causes in the * * * district courts of the United States shall conform, as near as may be, to the practice * * * existing at the time in like causes in the courts of record of the State within which such * * * district courts are held, any rule of court to the contrary notwithstanding." 17 Stat. 196, 197 (1872), 28 U.S.C. § 724. As originally passed this section contained a proviso that "nothing herein contained shall alter the rules of evidence under the laws of the United States, and as practiced in the courts thereof." This clause was dropped in 1878. U.S.Rev.Stat. § 914 (1878). See the discussion of the history of the Act in McCormick & Chadbourn, Federal Courts 484–487 (1957). The Conformity Act was repealed by the 1948 revision of Title 28 of U.S.C. because its provisions were in conflict with the Federal Rules and no longer had any force or effect. See 2 Moore, Federal Practice § 2.04 at 319–331. And respecting especially the effect of the Conformity Act and Rules of Decision on evidence, see 5 Moore § 43.02 at 1305–10. See Hill, State Procedural Law in Federal Non-diversity Litigation, 69 Harv.L.Rev. 66 at 76–90 (1955).

**4.** Ragan v. Merchants Transfer & Warehouse Co., 1949, 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520, concerned F.R.Civ. P. 3, 28 U.S.C.A. providing that a civil action "is commenced by filing a complaint

before Bernhardt[5] this led no less a distinguished authority in the field of the Federal Rules than Judge Charles E. Clark to express the opinion that the "drastic logic" in the pursuit of the goal of uniformity of outcome has brought to pass a situation in which "hardly a one of the heralded Federal Rules can be considered safe from attack by shrewd lawyers and obedient lower tribunals."[6] Others apprehend that Bernhardt perhaps imperils some federal procedural statutes as well.[7]

A consideration of this problem must take into account the more recent case of Byrd v. Blue Ridge Rural Electric Coop., 1958, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953. Whatever else it is thought to do,[8] it certainly amplifies what undoubtedly must have been implicit in the development of the "outcome-deter-

minative" test that all does not necessarily fall in the path of uniformity of result. So to determination of whether the application of the state rule would likely affect the outcome in a significant way must now be added the further one. Are there countervailing considerations reflecting substantial federal policies which outweigh in final balance the aim of like result? Declining to compel application of the state rule for non-jury trial of a particular issue, the Court expressed it this way. "Therefore, were 'outcome' the only consideration, a strong case might appear for saying that the federal court should follow the state practice. But there are affirmative countervailing considerations at work here. The federal system is an independent system for administering justice to litigants who properly invoke its jurisdic-

5. Bernhardt v. Polygraphic Co., 1956, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199. The Court construed the Federal Arbitration Act, 9 U.S.C.A. § 1, to apply only to maritime transactions and those involving commerce. The Court emphasized that if an alternative construction were followed "a constitutional question might be presented" since Erie "indicated that Congress does not have the constitutional authority to make the law that is applicable to controversies in diversity of citizenship cases." 350 U.S. at page 202, 76 S.Ct. at page 275, and see concurring opinion 350 U.S. 205–213, 76 S.Ct. 207–281.

with the court." The Court held, however, that under the state statute of limitations an action was deemed to be commenced only upon service of the summons. The quest for substantial equality of outcome requires, the Court said, that the state created cause of action carry "the same burden and is subject to the same defenses * * * as in the state court" so that "where local law qualifies or abridges it, the federal court must follow suit." 337 U.S. 530, at page 533, 69 S.Ct. at page 1235, 97 L.Ed. 1523. Cohen v. Beneficial Industrial Loan Corp., 1949, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528, concerned F.R.Civ. P. 23 prescribing limited protective devices in stockholders' derivative suits. The decision held that the federal court was bound to apply a state statute more drastic in nature.

6. Book Review, 36 Corn.L.Q. 181, 183 (1950).

7. One commentator, Alfred Hill, who has written extensively in this field, has said "After Bernhardt, it would seem that a number of federal procedural statutes are also vulnerable." Hill, The Erie Doctrine and The Constitution, 53 Northwestern University L.Rev., 427, 432. This article referred to hereafter as Hill is in two parts (pages 427–456 and 541–609). It discusses many of the problems growing out of Erie including the constitutional implications of Erie in procedural rules, legislative procedural statutes in relation to diversity cases and choice of law. Those problems growing out of the "substance"—"procedure" dichotomy most directly concerned with the area in this case are discussed at 428–437, 574–589, 601–607.

8. See Hill, 601–607. In the place of the "outcome-determinative" test, this author asserts that "Blue Ridge seems to be substituting two independent tests which are less simple to formulate and which will probably be more difficult to apply." 604. He emphasizes the Court's concern with whether the state statute was "merely a form and mode of enforcing" a claimed right or whether it was, on the other hand, "intended to be bound up with the definition of the rights and obligations of the parties." Byrd v. Blue Ridge Rural Elec. Coop., supra, 356 U.S. at page 536, 78 S.Ct. at page 900, 2 L.Ed.2d at page 962.

tion." 356 U.S. at page 537, 78 S.Ct. at page 900, 2 L.Ed.2d at page 926. The Court went on to say that "The policy of uniform enforcement of state-created rights and obligations * * * cannot in every case exact compliance with a state rule * * * " of a kind described as one "not bound up with rights and obligations." 356 U.S. at pages 537–538, 78 S.Ct. at page 901 , 2 L.Ed.2d 962–963. But on the Court's earlier statement this would include as well "state rules even of form and mode where the state rules may bear substantially on the question whether the litigation would come out one way in the federal court and another way in the state court if the federal court failed to apply a particular local rule * * *." 356 U.S. at pages 536–537, 78 S.Ct. at page 900, 2 L.Ed.2d 962.

■ Not the least of these countervailing considerations is the indispensable necessity that a tribunal, if it is to be an independent court administering law, must have the capacity to regulate the manner by which cases are to be tried and facts are to be presented in the search for the truth of the cause. As Erie epitomized, the constitutional factors subject federal courts in diversity cases to special limitations. But the jurisdiction of courts in such cases is no less constitutional than in non-diversity litigation. The judicial power of the United States vested by Art. III of the Constitution "in such inferior Courts as the Congress may * * * establish" is declared to "extend to all Cases, in Law and Equity * * *; to Controversies * * *—between Citizens of different States * * *." A United States District Court clothed with power by Congress pursuant to the Constitution is not a mere adjunct to a state's judicial machinery. In entertaining diversity cases it is responding to a constitutional demand made effective by congressional action and, as the recent abstention cases have made so clear,[9] it has a constitutional duty to hear and adjudicate.[10] Investment of this profound power and duty carries with it the capacity,[11] if not the affirmative obligation, to prescribe [12] such rules as will enable the federal district courts to fulfill these constitutional demands without, at the same time, trespassing upon others of equal and fundamental nature.

■ If a court or court system may adopt rules regulating the manner in which it is to achieve its organic function it surely has a capacity, if not a duty, for self-examination leading toward improvement in the process of judicial administration which, as a matter of public concern, is generally more important than even the quality of individual judgments. Steps in that direction will almost invariably be the rejection of old and former procedures, the adoption here and there of innovations introduced by other judicial systems, and a general restudy in the light of common experience of enlightened courts and a competent bar. But improvement cannot come, progress in the eradication of obstacles cannot be realized, unless there can be

9. See County of Allegheny v. Frank Mashuda Co., 1959, 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163; Louisiana Power & Light Co. v. City of Thibodeaux, 1959, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed. 2d 1058; NAACP v. Bennett, 1959, 360 U.S. 471, 79 S.Ct. 1192, 3 L.Ed.2d 1375; Harrison v. NAACP, 1959, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152.

10. Meredith v. City of Winter Haven, 1943, 320 U.S. 228, 234, 236, 64 S.Ct. 7, 88 L.Ed. 9, 13, 14–15.

11. This is developed at some length by Judge Friendly for the Second Circuit in Iovino v. Waterson, 1959, 274 F.2d 41 at page 48. In asserting this thesis the Court reckons with the reservation made in Levinson v. Deupree, 1953, 345 U.S. 648, 73 S.Ct. 914, 97 L.Ed. 1319; see also D'Onofrio Construction Co. v. Recon Co., 1 Cir., 1958, 255 F.2d 904, at page 910. See also Hill, supra, at 451–455.

12. We are here not concerned with distribution of that power as between the judiciary and the legislature since the Federal Rules of Civil Procedure bar the imprimatur of both the Supreme Court and of the Congress. See the Rules Enabling Act, 28 U.S.C.A. § 2072.

some unity of purpose. And this will be a recognition that what is created in response to the demand for improvement necessarily involves departures from the settled order whether local or beyond. An important countervailing policy consideration in the Blue Ridge sense therefore is the historic purpose of the Federal Rules and the forces which led Congress to pass the Rules Enabling Act. The broad aim, especially in fields of practice, was to reverse the philosophy of *conformity* to local state procedure and establish, with but few specific exceptions, an approach of uniformity within the whole federal judicial trial system. Indeed, the Court in Blue Ridge in its declaration that the Erie "policy of uniform enforcement of state-created rights * * * cannot in every case exact compliance with the state rule," 356 U.S. at pages 537–538, 78 S.Ct. at page 901, 2 L.Ed.2d at pages 962–963, took immediate note of this. "This Court held in Sibbach v. Wilson & Co., 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479, that Federal Rules of Civil Procedure 35 [compelling medical examination of a party] should prevail over a contrary state rule." 356 U.S. at note 12, page 538, 78 S.Ct. at page 901, note 12, 2 L.Ed. 2d at note 12, page 963.

Specifically in this case we deal with a question of evidence. The ex parte statement under oath is relevant and material to the cause. It has probative value of significance. All that kept it out was the District Court's conclusion that the Florida statute prohibited its use in any court. Is this Florida statutory rule one of procedure only? Of substance? Of "outcome-determinative" procedure? Or one of the latter offset by countervailing policies indigenous to the concept of a federal constitutional judiciary?

■ The answer will not come by any easy road leading to a destination marked "substance" or "procedure." For the most part rules of evidence are thought of as procedural in the traditional conflicts of laws sense. But they can be substantive just as well, as this Court pointed out in Willitt v. Purvis, 5 Cir., 1960, 276 F.2d 129. Under the state-created right of action for wrongful death, we held that under Georgia law evidence of separation and non-support from the deceased was irrelevant and hence inadmissible. This was done with full recognition of the Erie principle and the "outcome-determinative" standard subsequently developed. This was but an illustration of the fact that many so-called procedural rules may represent local policy on a level more fundamental than the regulation of remedy or practice as such and that by incidental effect or by design such rules in that sort of context are sometimes indistinguishable from principles traditionally regarded as substantive. In the field of evidence this may, for example, certainly include concepts of burden of proof.[13] More spectacular and probably the analogy closest to the problem with which we deal here relates to the various privileges against compulsory disclosure of protected confidential communications. There is great confusion [14] in this area with some federal courts holding the state privilege superior, the Federal Rules on discovery subordinate and others reaching the opposite conclusion.[15] The possible clash be-

13. See Cities Service Oil Co. v. Dunlap, 1939, 308 U.S. 208, 60 S.Ct. 201, 84 L. Ed. 196; and Palmer v. Hoffman, 1943, 318 U.S. 109, 117, 63 S.Ct. 477, 87 L.Ed. 645, 651.

14. See Louisell, Confidentiality, Conformity and Confusion: Privileges In Federal Courts Today, 31 Tulane L.Rev. 101 (1956); George W. Pugh, Rule 43(a) and the Communication Privileged Under State Law: An Analysis of Confusion, 7 Vand.L.Rev. 556 (1954).

15. The cases generally involve the relationship of attorney-client, doctor-patient, public accountant-client. Those holding the state privilege superior to the Federal Rules are: Palmer v. Fisher, 7 Cir., 1955, 228 F.2d 603, certiorari denied sub. nom., Fisher v. Palmer, 1956, 351 U.S. 965, 76 S.Ct. 1030, 100 L.Ed. 1485; noted: 44 Cal.L.Rev. 949 (1956) and see also Comment, 23 U.Chi.L.Rev. 704 (1956); Berdon v. McDuff, D.C.E.D. Mich.1953, 15 F.R.D. 29; Stiles v. Clif-

tween state privilege and a federal court ruling on evidence is instructive in several ways. It highlights the existence of state policies over and beyond the mere mechanics of a trial or its preparation. It illustrates also areas in which the outcome may be markedly affected depending on whether the privileged testimony may or may not be compelled.

For the most part, however, rules of evidence relate to what lawyers have long thought of as procedure.[16] This is attested by the presence of Rules 43 and 44 in the Federal Rules. The Rules Enabling Act denied the power of the Supreme Court in such Rules to affect substantive rights.[17] That the Supreme Court, after having this problem brought sharply to mind,[18] thought it appropriate to include them is some considered evidence that with respect to *admissibility* at least, the subject was procedural.

▇ To the extent that the receipt of evidence pertains to a matter within the procedural competence of the Federal District Court, it is controlled by F.R. Civ.P. 43(a).[19] In civil cases Rule 43 calls for the application of a three-pronged test of admissibility. [1] federal statutes, [2] federal equity practice, [3] state statutes, rules or common law. It has been stated often that Rule 43(a) is one which relates to *admissibility* not to *exclusion*.[20] A consideration of the

---

ton Springs Sanitarium Co., D.C.W.D. N.Y.1947, 74 F.Supp. 907; 2 Barron & Holtzoff, Federal Practice & Procedure, § 967 (1950).

To the contrary there is a substantial body of cases giving supremacy to the Federal Rules holding that the Federal Courts are not bound by state privilege: Scourtes v. Fred W. Albrecht Grocery Co., D.C.N.D.Ohio 1953, 15 F.R.D. 55; Brookshire v. Pennsylvania R. Co., N.D.Ohio 1953, 14 F.R.D. 154; Humphries v. Pennsylvania R. Co., D.C.N.D. Ohio 1953, 14 F.R.D. 177, noted in 3 Utah L.R. 521 (1953); Panella v. Baltimore & Ohio R. Co., D.C.N.D.Ohio 1951, 14 F.R.D. 196; Holbert v. Chase, D.C.E.D.S.C.1952, 12 F.R.D. 171; Willard C. Beach Air Brush Co. v. General Motors Corp., D.C.N.J.1953, 118 F.Supp. 242; United States v. Brunner, 6 Cir., 1952, 200 F.2d 276, 280; and cf. Ex parte Sparrow, D.C.N.D.Ala.1953, 14 F.R.D. 351, see comment, 23 U.Chi.L.Rev. 704 (1956).

16. "Rules of evidence should be treated within the domain of procedural law." 5 Moore, Federal Practice § 43.02[2] at 1310. See Morgan, Rules of Evidence—Substantive or Procedural? 10 Vand.L. Rev. 467 (1957).

17. 28 U.S.C.A. § 2072 (1959) provides that Rules promulgated thereunder "shall not abridge, enlarge, or modify any substantive right." We regarded this congressional limitation as decisive in Perry v. Allen, 5 Cir., 1956, 239 F.2d 107, invalidating the two-year limitation under F.R.Civ.P. 25(a) as to which see Iovino v. Waterson, 2 Cir., 1959, 274 F.2d 41, 45–48.

18. See 5 Moore, Federal Practice, pages 1316–1317 and 1303–1305; Morgan, Rules of Evidence—Substantive or Procedural?, 10 Vand.L.Rev. 467 at 468 (1957); and Joiner, Uniform Rules of Evidence for the Federal Courts, 20 F. R.D. 429, at pages 430–431.

19. Rule 43(a) provides:

"*Form and Admissibility.* * * * All evidence shall be admitted which is [1] admissible under the statutes of the United States, or [2] under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or [3] under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held. In any case, the statute or rule which favors the reception of the evidence governs and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made. The competency of a witness to testify shall be determined in like manner."

20. 5 Moore, Federal Practice, § 43.04 at 1319 states: "The cast of subdivision (a) is toward admissibility, not exclusion. As noted in United States v. Aluminum Co. of America, 'Rule 43 does not deal with the law as to what testimony should be excluded. * * * It is intended to liberalize admissibility of testimony, but has nothing to do with what should be excluded.'" See Atlantic Coast Line R. Co. v. Dixon, 5 Cir., 1953, 207 F.2d 899. Wigmore points out that in addition to the competency of witnesses, the defined scope of Rule 43(a) is "admissible" evidence and that "'admissi-

manner in which the Rule is to work demonstrates that there is much validity to this shorthand characterization. The Rule is stated affirmatively and in terms of liberality—"the statute or rule which favors the reception of the evidence governs." The fact, then, that a state statute or rule excludes the evidence does not, under the Rule, make it inadmissible.[21] Certainly that would not be so if either a [1] federal statute or [2] federal equity practice made it admissible. At the same time any such approach must be used with caution since exclusion is or may be the reverse of admission and it is commonly thought of as a synonym of *in*admissible. That would require, then, that careful regard be paid to the actual nature of the state policy behind the rule of exclusion. But it would not be Rule 43(a) which would keep out the offending evidence under a state exclusion. That result would come about from a total absence of a [1] federal statute or [2] a federal equity practice making it admissible, or, where either of those two were in existence, by virtue of factors akin to Erie.

Of course Erie will in specific situations put a limit on the current Rule as it likely would on the proposed Uniform Rules of Evidence for Federal Courts so

vigorously championed by many distinguished authorities.[22] But in the 22 years' experience under the Rules, the occasion has been infrequent when evidence admissible under the Rule had to be kept out because of Erie and its "outcome-determinative" standard. On the other hand, as these authorities point out, many cases have sustained the admissibility of specific evidence under the Federal Rule which would not have been admissible under the state concept.[23] These include at least one of our own.[24] And of specific importance here these include a case from the Sixth Circuit sustaining the admissibility of impeachment evidence under the Federal Rules which the state would have excluded.[25]

■ In considering our problem in the light of these factors, there are two specific facets: first, was the evidence "admissible" under Rule 43(a)? second, if so, are there yet Erie considerations which would call for its exclusion?

The first we dispose of quickly. In this we may assume that the evidence cannot qualify under [3] state rule because the statute prohibits its use. It is also clear that there is no [1] federal statute which will make it admissible. Category [2] federal equity practice admittedly poses some difficulties. Dis-

ble evidence' by no means covers all of the rules of Evidence." 1 Wigmore, Evidence, § 6c at 201 (3rd ed. 1940). See also Green, The Admissibility of Evidence under the Federal Rules, 55 Harvard L.Rev. 197, 203 (1941). "Rule 43 really does not say what is to happen when none of the three classes of precepts [see [1], [2], [3] in Rule 43 (a), note 19, supra] would admit. The rule merely provides that if any of the three makes the evidence admissible it shall be admitted." See 5 Moore, Federal Practice, § 43.04 at 1327: "* * * While state rules of *admissibility* are controlling in the federal courts, state *exclusionary* rules are not, and evidence admissible under either of the first two tests must be received even though the state courts would hold otherwise."

21. 5 Moore, Federal Practice, p. 1319.

22. See Charles W. Joiner, Uniform Rules of Evidence for the Federal Courts, 20 F.R.D. 429 (1957). As advocates for this cause he quotes from Wigmore, Morgan, Ladd and McCormick; see also Ronan E. Degnan, The Feasibility of Rules of Evidence in Federal Courts, 24 F.R.D. 341, Reprint of Paper delivered at the Judicial Conference of the Tenth Circuit, July 1959; and see the related paper, The Need for Uniform Rules of Evidence in the Federal Courts, delivered at the same conference by Judge Joe Ewing Estes, Northern District of Texas, 24 F.R.D. 331.

23. See Joiner, supra, 20 F.R.D. at pages 437–438.

24. New York Life Ins. Co. v. Schlatter, 5 Cir., 1953, 203 F.2d 184.

25. Erie R. v. Lade, 6 Cir., 1954, 209 F.2d 948.

cussed in detail by others,[26] it may be summarized in a sentence. The so-called federal equity practice is hard to locate or identify as such because of the dearth of appellate opinions discussing admissibility problems in non-jury trials and the practical habit of equity courts to look to common law decisions, including local state cases, for guidance in admissibility. Despite these conceptual difficulties, several things seem plain. First, the Supreme Court in adopting Rule 43(a) had no intention to confine contemporary federal courts in the application of standard [2] to those instances only in which the same or substantially the same evidence was held to be admissible in a reported decision, appellate or trial. Second, since federal equity courts in determining admissibility "heretofore" had been required to undergo the judicial travail of searching from many respectable sources—common law, state and federal, etc.—there was no purpose in a rule promulgated for the future either to prohibit or make unessential like efforts as new occasions required.

In this light, turning back the clock to pre-1938, can there be any doubt that a federal equity Chancellor would have held this evidence admissible for either one or both purposes? Use of prior inconsistent statements, or those claimed to be inconsistent, is one of the most ancient of the forensic weapons.[27] And had this suit been a pre-1938 equity Bill of Complaint by the Insurer to effectuate a forfeiture by reason of breach of the policy provisions against false swearing in connection with a loss,[28] the ex parte statement under oath would not only have been admissible, it would have been the very basis of the action. Such an equity proceeding would virtually start either with an assumption that the statement had been made or if controverted, then by proof that it was made. Upon that being established the real issue of the trial would then be whether such statement was the truth.

While we thus have no doubt that this evidence was admissible under [2] we think another factor is pertinent to Rule 43(a). It does speak in affirmative terms of admissibility, not exclusion. It defines the three standards for admissibility. But it does not purport to prohibit the admission of other relevant material probative evidence which, in the considered exercise of judicial wisdom, is trustworthy. There are probably few instances in which evidence proffered will not come within the three categories or, on the other hand, be expressly excluded. But in today's litigation with its endless complexities many of which are an outgrowth of our scientific age we would hardly think that a court instituted with all of the power the organic constitution could invest in it would have to stand helpless in the face of a new situation. Since it has vast duties and powers respecting both men's liberty and property, surely such court has the capacity to deal judicially with the manner of ascertaining the truth in a novel situation. At least federal district courts are no less potent than they were in pre-1938.[29]

At long last we come then to the crucial question: must the federal court, by virtue of this Florida statute, exclude evidence otherwise clearly admissible under Rule 43(a)? We think not.

26. 1 Wigmore, Evidence § 6c at 201 (3rd ed. 1940); 5 Moore, Federal Practice, § 43.04 at 1328; Atlantic Coast Line R. Co. v. Dixon, 5 Cir., 1953, 207 F.2d 899, 903; and see Green, The Admissibility of Evidence Under the Federal Rules, 55 Harvard L. Rev. 197, 200–202, 215–217.

27. See generally McCormick, Evidence, §§ 33–39 (1954).

28. "If the insured has been guilty of wilful fraud or false swearing, he cannot recover. * * * The fraud would not only forfeit the policy, but would also forfeit any claim of loss." Appleman, Insurance Law & Practice, § 3587 at 761–762.

29. Indeed, they are probably more so. The repeal of the Conformity Act, note 3, supra, either impliedly by § 2 of the Rules Enabling Act, see note 17, or by formal enactment in 1948 eliminates any compulsory state standard as to "procedural" matters.

One thing seems quite certain. This evidence cannot be excluded under the "outcome-determinative" test. To say this does not detract from its probative force or its substantial materiality and relevance. But impeachment evidence can rarely be classified as so decisive in nature that it would in all reasonable probability have a significant effect on the outcome. Most of us in our former days have suffered the anguish of defeat where judge or jury or both credited an adversary's evidence despite a devastating attack based on significant prior inconsistent statements. When carefully analyzed no different conclusion is reached concerning the use of the statement to sustain the defense of forfeiture for breach of the policy warranty against false swearing. If the statute could keep it out altogether, it would of course, leave a void in the insurer's case. In that situation, the insurer might likely lose where with it the insurer might prevail. To state it in reverse, the plaintiff-assured might fare better since he would reckon with one less defense. Thus far it apparently bears on outcome. But as we discuss later the statute is aimed in the direction of disclosure. Consequently, an insurer faced with this situation, would be able to use several devices under the Rules to get the benefit of the statement but without trespassing on the Florida policy. This could include a request by the insurer that the plaintiff-assured, under F.R.Civ.P. 36, admit the correctness (or the truth) of the ex parte statement. It could include as well the incorporation of significant portions of the ex parte statement within the insurer's answer itself or as an exhibit annexed to it. As in a case of a suit on a promissory note set out verbatim in the complaint, the matter would then be put in issue either by the formal reply of the adversary or the implied denial under F.R.Civ.P. 8(d).

By the use of such mechanisms both the objective of the Federal Rules and the Florida policy would be achieved. The very use of these devices would result in the disclosure which the Florida statute seeks.

Consequently, only to the most unresourceful advocate would this Florida statute ever stand in the way of establishing the fact of (a) the making of the ex parte statement and (b) the untruthfulness of it. The "outcome-determinative" test must require as a minimum that all reasonable steps open to a skilled, competent advocate have been taken to overcome or ameliorate the consequences of the state rule. Otherwise it could not be said that it was by virtue of a federally imposed rule contrary to that of the state that the outcome would be significantly affected.

Nor can we find any other factors implicit in the Erie concept that will compel its exclusion. To be sure, this reflects a domestic policy of Florida which—somewhat like that of confidential privilege—we may assume relates to something more fundamental than the mere machinery of enforcing a right in court. The prohibition against admissibility, of course, relates to court proceedings. But this is primarily a sanction thought by Florida to be most compelling in order to effectuate the policy. That Florida policy is one of requiring disclosure to him of any statement relating to the occurrence made by a person who has sustained injuries to his person or to his property.

But a plaintiff seeking to recover damages for injury to his person or property is not going to find the federal court in Florida hostile to this Florida policy. Indeed, the Rules have as their broad aim the disclosure of all relevant matters before trial. We need not catalogue each of those Rules, nor do we intimate how a trial judge in the wide discretion inevitably reposed in him in the pretrial governance of a case should or could rule on such a matter. For here the plaintiff did not invoke a single device either in pretrial discovery or on the trial. What he did, and what he was content to do, was to stand firmly on the Florida statute and assert it as an obstacle to any discretionary action by the

District Judge. To be sure, initially and later by letter a demand had been made by plaintiff's counsel upon the Insurer's counsel. But this demand was itself couched in terms of the Florida statute. It did not purport to be a demand under any federal Rule. What the plaintiff hoped to do, and what he finally did do, was to use the Florida statutory policy of disclosure as an effective means of *concealing* the fact. We imply no disparagement of this tactic, but it demonstrates that there is nothing about the Florida policy reflecting in this statute or any theoretical conflict with F.R.Civ. P. 43(a) which compels the enforcement of the sanction of inadmissibility.

There are ample Federal Rules to achieve this same policy aim of disclosure if they are but used. For example, with respect to the substantive defense of false swearing, the ex parte statement was the very gist of the defense. It seems perfectly obvious that the plaintiff would need that statement in preparing for trial to meet that defense. Rule 34 would undoubtedly be available for the production of the statement to permit it to be copied by the plaintiff.[30] Seeking a copy in advance of trial by the plaintiff

in anticipation of its probable use by the defendant for impeachment purposes would introduce some new factors for the judge to consider under good cause.[31] But we cannot anticipate that federal district judges sitting in Florida will fail to exercise a considered and wise judicial discretion in passing upon such requests. A factor permissibly open for evaluation in that process would be the declared statutory policy of Florida to make such statements available to the one who gave it. Until it is shown that operation of all of the Federal Rules substantially thwarts the Florida policy of this statute there is no occasion for subordinating Rule 43(a) to the local rule.

The evidence was admissible. The District Court was in error in excluding it under the Florida statute. By nature, it was material, relevant and highly probative. The jury was entitled to hear it and the error of its exclusion was harmful, F.R.Civ.P. 61. A new trial is required.

Reversed and remanded.

JONES, Circuit Judge, concurs in the result.

---

30. The real quarrel here seems to be over payment of the cost of the copy. The ex parte statement was taken before a court reporter employed by the Insurer. The Insurer declined, both at the time of taking and later, to furnish a copy free. The plaintiff, present by counsel, had another court reporter take the statement, but it has never been transcribed. F.R.Civ.P. 34 with its "good cause" requirement and the reference to Rule 30(b) can effectively handle this matter to make certain that financial costs are fairly apportioned. Especially is this so since the Rule relates

to an order to "produce and permit the inspection and copying * * * of any designated documents * * *." Ordinarily, it does not require the adversary to furnish copies. See Moore, supra, $34.19 [2] especially at 2477. And F.R.Civ.P. 37 is available to secure effective compliance by both parties.

31. The showing for production of a copy of the plaintiff's own statement is different from that seeking copies of statements of other witnesses generally. Mitchell v. Johnson, 5 Cir., 1960, 274 F.2d 394, 401; 4 Moore, Federal Practice § 26.23[8] at 1141–1149.