Frank C. UIBLE, Appellant,

v.

Beverly W. LANDSTREET, III, et al., Appellees.

No. 24633.

United States Court of Appeals Fifth Circuit.

April 5, 1968.

C. Harris Dittmar, Robert P. Smith, Jr., Charles P. Pillans, Jacksonville, Fla., for appellant, Ramsaur & Roquemore, Bedell, Bedell, Dittmar & Smith, Jacksonville, Fla., of counsel.

John D. Corse, Charles H. Murchison, Ulmer, Murchison, Ashby & Ball, Jacksonville, Fla., for appellees.

Before BELL, GOLDBERG and DYER, Circuit Judges.

DYER, Circuit Judge:

Appellant Uible, a resident of Jacksonville, Florida, brought suit in the United States District Court for the Middle District of Florida to recover the face amount of and interest due him on a $490,500 promissory note given by appellees Landstreet, Clark, Nelson, Kirkpatrick and Bass, Jr.,[1] all residents of Nashville, Tennessee, in their purchase of 100,000 shares of Uible's stock in Charter Mortgage and Investment Company, a Florida corporation.

The complaint alleged that Uible's claim for relief "arises out of a transaction connected with or incidental to a business venture, conducted, engaged in and carried on by the defendants, and each of them in the State of Florida." The original process was served on Florida's Secretary of State as agent for the appellees in accordance with section 47.-16 F.S.A.[2]

Appellees contested the District Court's jurisdiction over them under

---

[1]. For convenience, collectively hereafter referred to as Landstreet's group.

[2]. That section provides in pertinent part: 47.16. Service of process upon nonresident engaging in business in state.

(1) The acceptance by any person or persons, individually, or associated together as a copartnership or any other form or type of association, who are residents of any other state or country, and all foreign corporations, * * * of the privilege extended by law to nonresidents and others to operate, conduct, engage in, or carry on a business or business venture in the state, * * * shall be deemed equivalent to an appointment by such persons and foreign corporations of the secretary of state of the state as the agent of such persons or foreign corporations upon whom may be served all lawful process in any action, suit or proceeding against them, or either of them, arising out of any transaction or operation connected with or incidental to such business or business venture, and the acceptance of such privilege shall be signification of the agreement of such persons and foreign corporations that any such process against them or either of them, which is so served shall be of the same legal force and validity as if served personally on such persons or foreign corporations. * * *

Florida's long arm statute. The court held that the obligation sued on was not created in connection with or incidental to a business venture engaged in by the appellees in Florida and dismissed the action. We affirm.

Each member of Landstreet's group was in the investment business in Nashville, Tennessee. For about twelve years prior to June, 1962, all except Bass, Jr. were equal owners of the stock of Clark, Landstreet and Kirkpatrick, Inc., a corporation that acted as a broker in buying and selling listed and over-the-counter stocks and other securities. Bass, Jr. was an employee of Jack M. Bass & Company, another Nashville, Tennessee, investment company competing with Landstreet's firm. Uible was one of the organizers of the Charter Company, a Florida corporation, and owned a substantial block of its stock.

On March 29, 1962, in Nashville, Tennessee, Landstreet's group executed and mailed to Uible in Jacksonville, Florida, an agreement to purchase from him 100,-000 shares of stock of the Charter Company. The offer proposed that the purchase be closed in Jacksonville, Florida, on April 10, 1962. It also provided that the total price was $654,000 payable in four equal payments of $163,500, the first on the date of closing and the others in installments on or before one, two and three years thereafter, the deferred payments to be evidenced by a promissory note secured by a pledge of 75,000 shares of the stock purchased, the pledge agreement and the pledged stock to be delivered to a designated Jacksonville bank which would release 25,000 shares at a time upon receipt of the three annual payments. Uible accepted the offer, executed the agreement on March 31, 1962, and returned it by mail to Landstreet's group in Nashville.

On April 9, 1962, Landstreet's group executed in Nashville a promissory note for the balance of the purchase price of the stock and a pledge agreement. These documents were mailed to Landstreet in care of an attorney's office in Jacksonville, Florida. On April 10, 1962, Landstreet attended the closing and delivered the note and pledge agreement to Uible. The funds for the initial payment of the purchase price were transmitted through normal banking channels and the first twenty five thousand shares of stock of the Charter Company were released by Uible. The remaining 75,000 shares of the company were deposited in a bank under the pledge agreement as security for the balance of the purchase price represented by the note.

In July, 1962, Landstreet attended the annual stockholders' meeting of the Charter Company in Jacksonville. He exercised by proxy the voting rights of the group's 75,000 shares of stock, and voted 10,000 shares of stock owned by him personally, as well as 1,000 shares of stock owned by one of his customers.

At the request of the president of the company with whom Landstreet had previously dealt extensively, Landstreet nominated management's slate of directors which included D. R. Buttrey of Nashville, who had agreed to serve on the board at the request of the president.

Following the stockholders' meeting, Landstreet was invited to and attended a luncheon meeting of the directors. He did not actively participate in the meeting, but he was asked about the possibility of putting together some companies for acquisition by the Charter Company. Landstreet agreed to look into this with the understanding that he would handle the underwriting. After this meeting neither Landstreet nor any of his group attended any stockholders' or directors' meeting of the Charter Company.

Shortly after the events here related transpired, the Charter Company suffered financial difficulties. On three occasions Landstreet visited the Company's offices, mostly in conjunction with other business affairs he had in Florida, to confer with the president and other officers of the Charter Company about the company's problems. Thereafter, in 1963 and 1964 Landstreet kept in touch

by telephone with the company's officers and visited Jacksonville two or three times each year to discuss the progress of the Company and its operations.

On this showing, made by affidavits and depositions, the District Court rejected Uible's contentions that his claim arose out of a business venture consisting of (1) the execution of a note and "the purchase by defendants of common stock of the Charter Mortgage and Investment Company" and (2) "the active participation by defendants in the affairs of that corporation for the purpose of increasing the value of such stock so that it could be sold at a profit."

■ The argument that the execution of a promissory note by Landstreet's group and its delivery in Florida where it was to be performed constitutes a business venture in Florida within the contemplation of section 47.16 Florida Statutes, F.S.A., may be disposed of summarily. The Florida courts have held the contrary, Odell v. Signer, Fla. App.1964, 169 So.2d 851, 853; aff'd, Signer v. Odell, Fla.1965, 176 So.2d 94; and so must we, e. g., Monarch Ins. Co. of Ohio v. Spach, 5 Cir. 1960, 281 F.2d 401.

We are also unpersuaded by Uible's contention that Landstreet's trip to Jacksonville, Florida, for the closing of the stock purchase was an important jurisdictional element. Florida Investment Enterprises, Inc. v. Kentucky Co., Inc., Fla.App.1964, 160 So.2d 733, upon which he relies is clearly distinguishable. In that case the non-resident defendant executed a lease on a motel in Florida and "by this instrument committed herself to the accomplishment of many affirmative acts which amounted to operating, conducting, engaging, or carrying on a business or a business venture in this state. Furthermore, it is clearly evident from the record that the instant motel business would not be in existence had not Mrs. Hayes executed the lease." Id. at 740. Landstreet's group made no such commitments.

■ We must be guided, with respect to the other contentions of Uible, by the accepted principle that causes of this kind "are not susceptible of an inflexible or fixed rule of law, but must be decided on the facts peculiar to each case as it arises," Williams v. Duval County Hospital Authority, Fla.App. 1967, 199 So.2d 299, 301; accord, Phillips v. Hooker Chemical Corp., 5 Cir. 1967, 375 F.2d 189, 192; Tetco Metal Products, Inc. v. Langham, 5 Cir. 1968, 387 F.2d 721; Woodham v. Northwestern Steel & Wire Co., 5 Cir. 1968, 390 F. 2d 27, for no case has been cited to us and we have found none in which the Florida Courts have applied section 47.16 in any case involving a similar factual situation.

■ The evidence is undisputed that Landstreet's group purchased Uible's stock and held it as a personal investment to make a profit. As shown above, the stock purchase alone is insufficient to bring Landstreet's group within the reach of the statute. Since the mere ownership and maintenance of real property in Florida do not bring the owner within the purview of section 47.16, James v. Kush, Fla.App.1963, 157 So.2d 203, 205,[3] the ownership of corporate stock must clearly be without the scope of the statute.

While the fact that Landstreet's group held almost ten percent of the stock of the Charter Company may seem significant, it is not when viewed in the light of decisions which have refused to uphold substituted service on foreign corporations which had *wholly* owned Flor-

3. Wm. E. Strasser Construction Corp. v. Linn, Fla.1957, 97 So.2d 458, relied on by Uible is neither contrary to *Kush* nor does it stand for the proposition that profit motive alone is evidence of a business venture. In *Strasser* the property was brought and an agreement executed for the construction of apartments by non-residents. The court found that the defendants were "initiating the first substantial steps toward setting themselves up in a business venture in this state." Id. at 460.

ida subsidiaries. In Berkman v. Ann Lewis Shops, Inc., 2 Cir. 1957, 246 F.2d 44, the court relied on Crockin v. Boston Store of Fort Myers, 1939, 137 Fla. 853, 188 So. 853, and held that complete ownership of the stock of a Florida corporation by a non-resident corporation did not, standing alone, constitute doing business in Florida. *Crockin* still has vitality. It was relied upon by the Florida District Court of Appeal in Odell v. Signer, supra, in 1964, which was affirmed by the Supreme Court of Florida in 1965.[4]

We conclude that the mere ownership of stock in the Charter Company by Landstreet's group cannot be used as the basis for substituted service under section 47.16. Uible urges, however, that if the execution of the note and the purchase of the stock by Landstreet's group is not enough, the totality of the circumstances show that Landstreet and Clark came to Florida and purposely engaged in substantial business activity calculated to enhance the defendants' investment. Thus, it is argued, this case is to be contrasted with those in which the non-resident defendant simply invests in property located in Florida and does not carry on other activities in Florida in connection with his investment.[5]

We would agree that if the facts of this case squared with those upon which Uible's argument is predicated. Landstreet's group would have been bound by substituted service. But what actually transpired demonstrates the error of the premise. None of Landstreet's group ever served on the board of directors of the Charter Company, nor did they exert any control directly or indirectly over the affairs of the corporation. The evidence is compelling that the group had no agent or representative on the board. Kirkpatrick, Bass, Jr. and Nelson were never in Florida in connection with the Charter Company. Clark visited the corporation's offices in 1963 and 1964 incidental to his attendance at conventions of investment brokers. Landstreet attended a stockholders' meeting in 1962 at which he voted his personal stock and, by proxy, that of his group, and nominated a slate of directors at the request of the president. He later attended a directors' luncheon but did not participate in the meeting, although he subsequently expressed a willingness to attempt to put together a group of companies as an underwriter. Nothing further came of this. Landstreet attended no other meetings. He and his customers had a large investment in the company, and in the summer of 1962 he became understandably concerned when he discovered that the company had and was incurring substantial losses, so he kept in touch with the officers by telephone and visited them occasionally in 1963 and 1964 to inquire about the company's problems and progress. Put succinctly, this simply adds up to the purchase of stock in a Florida corporation by a group of non-residents, attendance by one of them at a stockholders' meeting, and inquiry about the financial affairs of the corporation. No Florida court has held, or would hold we think, that such investment activities are within the scope of section 47.16, F.S.A., Cf., Unterman v. Brown, Fla.App.1964, 169 So.2d 522.

The conclusion we have reached pretermits the necessity of passing on the constitutional issue of due process. See New York Times Co. v. Conner, 5 Cir. 1961, 291 F.2d 492, 496.

Affirmed.

4. Section 47.16 was amended in 1957 by adding subsection 2 which applies to persons, firms or corporations which sell, consign or lease property to Florida persons, firms or corporations. The amendment does not by its terms apply to non-residents who *purchase* property *from* Florida residents.

5. Cf. James v. Kush, *supra*; Toffel v. Baugher, Fla.App.1960, 125 So.2d 321.