The **MUTUAL LIFE INSURANCE COMPANY OF NEW YORK**, a corporation, Appellant,

v.

**Ruth K. BOHLMAN**, Appellee.

No. 7296.

United States Court of Appeals
Tenth Circuit.

Feb. 17, 1964.

Rehearing Denied March 17, 1964.

Ben L. Burdick, Oklahoma City, Okl. (L. E. Stringer, Crowe, Boxley, Dunlevy, Thweatt, Swinford & Johnson, Oklahoma City, Okl., and Richard I. Fricke, New York City, on the brief), for appellant.

John Joseph Snider and James D. Fellers, of Mosteller, Fellers, Andrews, Snider & Baggett, Oklahoma City, Okl. (E. Blumhagen, Watonga, Okl., on the brief), for appellee.

Before MURRAH, Chief Judge, and HILL and SETH, Circuit Judges.

HILL, Circuit Judge.

The appeal, in a diversity case, involves the right of appellee, Ruth K. Bohlman, as the beneficiary under a life insurance policy written upon the life of her deceased husband, to recover from appellant, The Mutual Life Insurance Company of New York, the proceeds from such policy. Trial of the case was had to a jury in the court below, with a verdict in favor of the beneficiary resulting. The appeal is taken from the judgment entered pursuant to the jury verdict and from the order of the court denying the defendant's motion for a new trial.

The issuance and delivery of the policy of insurance and the payment of the first premium are not in dispute. The defenses raised in the case as set forth in the pre-trial transcript and order are: (1) That the policy never went into effect because it was not delivered to the insured and the first premium paid during the insured's good health; and (2) that the true state of the insured's health was misrepresented to and concealed by him from the company.

Appellant first urges that, under the evidence presented at the trial, its motion for a directed verdict at the close of all of the evidence should have been sustained or, after the verdict, the trial court should have sustained its motion for judgment notwithstanding the verdict.

A chronological statement of the undisputed facts, as shown by the record is necessary: The insured, a practicing

physician in Watonga, Oklahoma, was solicited by the company's agent, who was his personal friend. The non-medical portion of the application was completed on October 9, 1959. The medical portion was completed on October 17 with Dr. A. K. Cox, an associate of the insured in the Watonga Clinic, as the medical examiner. The medical history was shown to be negative, except for "infectious hepatitis" in 1938. As a routine matter, a "Retail Credit Report" was obtained by the company on the applicant, and it stated "[w]e find that some five or six years ago he was believed to have had some kind of heart ailment. * * *" This report prompted a letter from the company's home office to Dr. Cox, requesting information about any such heart attack. Dr. Cox replied, in substance, that the applicant had no health problems and that his heart and blood pressure were the same as on the date of the medical examination.

The company then made a requirement that a current electrocardiogram (EKG) be taken of the applicant and the agent was so informed. He, in turn, advised the applicant. On November 12 an EKG was taken at the Watonga Clinic and it showed an abnormal tracing. The EKG was not sent to the company, but it was sent by Dr. Cox to Dr. F. Redding Hood, a heart specialist at Oklahoma City, for interpretation. Dr. Hood's interpretation was: "Myocardial changes compatible with acute injury stage of a myocardial infarction in the posterior area." On November 20 a second EKG was taken at the direction of Dr. Cox at the clinic and sent to Dr. Hood for evaluation. At this same time Dr. Cox advised Dr. Hood that "[s]moking discontinued 1 week—Other features—Peritrate T.i.d.—Will repeat in 1 week." Dr. Hood reported his findings to Dr. Cox.[1] On November 27, Dr. Cox had another EKG of the insured taken and it was sent to Dr. Hood as were the others. His report showed some slight progression of the process as compared with prior EKGs.

The insured was admitted to the Watonga Hospital on December 5 as a patient and remained there until December 12. The hospital records show that the diagnosis of his condition was "acute cervical radiculitis", but they also reflect that his medication during this period consisted of nitroglycerine and peritrate, both recognized heart medications, and dramamine, an anti-nausea drug. During his hospitalization and on December 8, Bohlman submitted to another EKG which, according to Dr. Hood's interpretation and report, showed no essential change from the one taken on November 27. On December 10 Bohlman, while still a patient at the Watonga Hospital, made a trip to Oklahoma City for the purpose of consulting Dr. Hood. At that time he submitted to another E KG and also to physical examination. Dr. Hood's report on this occasion was to both Dr. Cox and the insured.[2]

On December 14 the manager of the company's Tulsa agency sent an EKG,

1. These findings were in part as follows:
"Some changes compatible with residuals of myocardial infarction in the posterior portion of the left ventricle, with some myocardial ischemia in the anterior portion of the left ventricle. In comparison with the ECG of 11/12/59, there has been some progression of the process, as far as the posterior area is concerned but definite improvement as far as the myocardial ischemia in the anterior area. The ectopic beats present in the ECG of 11/12/59, are not present at this time."

2. The report stated, in part, as follows:
"Interpretation: Myocardial changes compatible with residuals or myocardial

infarction, posterior portion of the left ventricle. As far as the changes compatible with myocardial ischemia in the anterior portion of the left ventricle are concerned, there has been marked improvement since the ECG of November 27, 1959.
"Impression: I am quite pleased with Dr. Bohlman's progress and I feel, if we can continue with restriction of his activity and his Peritrate, we should have a great deal of improvement, in the near future."

dated December 8, to the company's home office. It had been received by him in an envelope postmarked December 11 at Watonga. This EKG was interpreted by the company's home office medical director, Dr. Lempke, as abnormal and was the only one ever furnished to the company with reference to the insurance application. The company had no knowledge that the other EKGs had been taken until after the death of the insured. The home office medical examiner wrote Dr. Cox on December 16 for further information about the applicant and inquired whether any other EKGs had been taken of Bohlman within the past five years. On December 21 Dr. Cox, in reply, advised that the EKG sent in had been taken sometime in November and was the first Bohlman had ever had taken; that both he and Dr. Bohlman were " * * * at a loss to explain such findings since there has never been an acute episode in his history nor any other suspicions of cardiac involvement. As a physician practicing in the same building for the past twenty years, I have never known him to have a sickness which could possibly be interpreted as heart trouble. * * * "

Unknown to the company, on December 26, Bohlman again entered the Watonga Hospital for three days and took peritrate. The diagnosis of his condition was shown upon the hospital records as cervical radiculitis.

On December 30, at the suggestion of the company's soliciting agent, Dr. Moore, the chief medical examiner for the company, called Dr. Bohlman on the telephone to discuss the EKG received by the company. Dr. Bohlman, in that conversation, stated in substance that the EKG sent in to the company was the first one he had ever had made and that he had never had any symptom at any time that might be related to an acute heart episode. He further stated the only previous illnesses he had was an attack of diarrhea and vomiting in the summer of 1959 and an attack of hepatitis in 1938. Dr. Bohlman did not mention the other EKGs that had been taken, his consultation with Dr. Hood, his hospitalization in the Watonga Hospital or the medications he had taken for his condition.

On December 31 the home office approved the application for insurance, the policy to be written on a Class 3 basis which required a higher premium. On this same day Dr. Bohlman made claim to another insurance company upon his health and accident policy for disability benefits from November 12 to an undetermined future date. In this claim, he stated that his disability was caused by "myocardial infarction, left ventricle, postereolaceral with ischemia" and described his symptoms as "pain in chest, shoulders and arms." Dr. Cox was named as his physician, his hospitalizations were shown and he claimed total disability.

On January 12, 1960, Dr. Bohlman again consulted Dr. Hood in Oklahoma City and another EKG was taken, which showed no essential changes in the heart condition since the one of December 12. On January 18 the policy was issued by the company and on January 20 it was delivered to Bohlman. At the company's request and because of the time lapse since the signing of the application, the insured was required to sign a written personal health statement. In this statement Dr. Bohlman represented that, since the date of the application, he had not (1) been in poor health, (2) consulted or been treated by any physician for any purpose, (3) been in a hospital for any medical purpose, or (4) had any injury, illness, disease, operation or medical tests. The trial court excluded this statement from evidence upon objection by counsel for the beneficiary and we will consider its admissibility separately. Dr. Bohlman died of a massive coronary attack on August 16, 1961, and the company, after an investigation, denied liability on the policy.

The defense of the case in the trial court, and as urged here, is bottomed upon the apparent changes in Dr. Bohlman's condition of health between

the date of his application and the delivery of the policy, over three months later, and the alleged concealment and misrepresentation by Bohlman of his true condition of health. The general rule in this area of the law is set out in 9 Couch on Insurance 2d, § 38:22, p.p. 347–348, as follows:

> "The mutual good faith which is required in a contract of life insurance will not permit a recovery where the insured intentionally withholds or conceals material changes in the condition of his health between the date of his examination by the insurer's physician and the delivery of the policy and which is of such a nature as to affect his insurability, make him a hazardous risk and thus amount to a fraud on the insurer. For example, where one, after applying for life insurance, learns that he is afflicted with a fatal disease, his failure to disclose that information constitutes an intentional concealment of a material fact which will avoid a policy subsequently delivered in ignorance of the insured's diseased condition.
>
> "Where between the date of the application and the issuance of the policy the insured consulted a physician, who reported a serious ailment, the insured must disclose this even though there has been no change in the physical condition of the applicant after the application was made."

■ In Stipcich v. Metropolitan Life Insurance Co., 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895, the plaintiff sought to recover, as the beneficiary, under a life policy issued upon the life of her deceased husband. The company defended upon the ground that the insured, after the application but before delivery of the policy, had consulted a physician and learned that he had suffered a recurrence of a duodenal ulcer, which later caused his death, and that he failed to reveal this information to the company. The court pointed out that if, while the company deliberates upon the issuance of the policy, the applicant discovers facts which make portions of his application untrue, he is required to make a full disclosure of those facts to the company. If he does not do so, the company has a valid defense to any suit on the policy.

The insured therefore had a duty to disclose to the company all of the apparent material changes in the condition of his health that came to his attention between the date of application and delivery of the policy. The evidence clearly shows that the insured did not fulfill his duty in this respect. In fact, if the health statement executed by the insured on January 20 is admissible as appellant claims it is, then the insured not only failed to disclose the apparent changes in health but actively misrepresented the state of his health up to the time the policy was delivered to him. We therefore must determine whether the health statement is admissible.

■ An Oklahoma statute, 36 Okl. Stat.Ann. § 3608, makes an application for a policy of life insurance inadmissible in evidence in any suit relative to the policy unless such application is attached to or otherwise made a part of the policy. Appellee urges here, as she did with success in the court below, that the health statement signed by the insured upon delivery of the policy constitutes a part of the application and since it was not attached to or otherwise made a part of the policy, the trial court correctly held that under the above statute it must be excluded from evidence. We have some doubts as to whether the health statement can be considered a part of the application within the purview of the statute. However, even if it is covered by the Oklahoma statute so as to bar its admission into evidence in a state court, that is not controlling in a federal court.

■■ It seems to be well settled that questions concerning the admissibility of evidence in a diversity case are procedural matters to be governed by application of federal law and not substan-

tive matters which are governed by state law. Shahid v. Gulf Power Company, 5 Cir., 291 F.2d 422, cert. denied, 370 U.S. 923, 82 S.Ct. 1563, 8 L.Ed.2d 503; Hambrice v. F. W. Woolworth Company, 5 Cir., 290 F.2d 557. The admissibility of evidence in federal court is governed by Rule 43(a), F.R.Civ.P., 28 U.S.C.A., which provides that all evidence shall be admissible which is admissible under: (1) Any federal Statute; (2) any rule of federal equity practice; or (3) the practice of the state where the court is held. See 5 Moore's Federal Practice, § 43.04, pp. 1319–1329. This Court has said that "* * * Rule 43(a) is 'a rule of admissibility, not a rule of exclusion'" and it "* * * is designed to favor the reception of all the evidence 'which properly may be introduced in respect to the point in controversy.'" United States v. Featherston, 10 Cir., 325 F.2d 539. It directs us to follow the rule, state or federal, which favors the admission of evidence. N.L.R.B. v. Tex-Tan, Inc., 5 Cir., 318 F.2d 472; Hambrice v. F. W. Woolworth Company, supra; Dallas County v. Commercial Union Assurance Co., 5 Cir., 286 F.2d 388. The fact that certain evidence might be inadmissible under a state exclusionary rule or a state statute, such as is involved here, is not controlling in the federal courts. United States v. Featherston, supra; Monarch Insurance Company of Ohio v. Spach, 5 Cir., 281 F.2d 401. "* * * while state rules of *admissibility* are controlling in the federal courts, state *exclusionary* rules are not, and evidence admissible under either of the first two tests must be received even though the state courts would hold otherwise. The rule of Erie R. Co. v. Tompkins, [304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188], limited as it is to matters affecting substantive rights, does not compel a different result." 5 Moore's Federal Practice, § 43.04, p.p. 1327–1328.

■ We have not been referred to any exclusionary principle laid down by any federal statute or rule of federal equity practice which would make the health statement inadmissible. Accordingly

and since admissibility under Rule 43(a) is on the basis of relevancy and materiality, 5 Moore's Federal Practice, § 43.04, p. 1319, we need only say that it is both relevant and material, and that it should have been admitted into evidence at the trial and may properly be considered a part of the appellant's evidence here.

■■ This brings us to the question of whether the knowledge acquired by Dr. Cox as to the insured's condition of health is imputed to, and binding upon, the company. Appellee takes the position that this is a jury question which was resolved against the company and therefore, the knowledge of Dr. Cox being imputed to and binding upon the company, the company has waived and is estopped to assert that the insured misrepresented and concealed the state of his health, as a defense to the action. It is true that as a general rule knowledge obtained by an agent of an insurer while acting within the scope of his authority is imputed to the insurer and this rule applies to a medical examiner such as Dr. Cox. 3 Couch on Insurance 2d, §§ 26:132, 26:-151, p.p. 655–663, 701–703. The underlying reason for the rule is that "* * * an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest. * * *" Colonial Sugar Co. v. Waldrep, 121 Okl. 31, 246 P. 623, 625. But, the rule does not apply when the third party knows there is no foundation for the ordinary presumption—when he is acquainted with circumstances plainly indicating that the agent will not advise his principal—as it is intended to protect those who exercise good faith, and not as a shield for unfair dealing. Mutual Life Insurance Co. of New York v. Hilton-Green, 241 U.S. 613, 36 S.Ct. 676, 60 L.Ed. 1202; Colonial Sugar Co. v. Waldrep, supra. See also Allen & Scott v. Stahl, 181 Okl. 527, 75 P.2d 204; Nichols v. Stahl, 182 Okl. 191, 76 P.2d 1043.

We believe that the exception, rather than the general rule, applies here and that the knowledge of Dr. Cox cannot be

imputed to the company. Dr. Cox was not only the medical examiner for the company but was Bohlman's professional associate in the operation of the Watonga Clinic. During the course of events he became Bohlman's attending physician as shown by the hospital records and his communications with Dr. Hood about Bohlman's heart condition. He possessed the same information about the insured's health condition as that possessed by Bohlman himself, including the medication being taken, the sudden withdrawal from cigarettes and restriction of activities. Some of the EKGs were taken of Bohlman's heart at his direction and, admittedly, he had knowledge of Bohlman's "total disability" claim against another insurance company. With this knowledge of Bohlman's condition of health, Dr. Cox, in replying to a letter from the company's home office regarding the one EKG sent to that office, failed to take the opportunity to inform the company of it.[3]

According to the evidence, while Dr. Cox was supposed to be conducting the medical examination for the company, it was the insured who decided which EKG was to be sent to the company and, at the same time, issued instructions to delete Dr. Hood's interpretation from that EKG. Finally, the evidence clearly shows that the insured was well aware of the fact that Dr. Cox had not advised the company of the state of his health. This is conclusively demonstrated by the conversation the insured had with the company's chief medical examiner on December 30, just one day before the application was approved and about 20 days before the policy was delivered to him. To apply the rule imputing knowledge from Dr. Cox to the company under these circumstances would, in our opinion, undermine the purpose and intention of that rule. Rather than protect those who exercise good faith, it would be an example of using the rule as a shield for unfair dealing, which is contrary to the clear intent and purpose of such rule.

Lastly, we must determine whether the court below should have directed a verdict in favor of the appellant. We are, of course, mindful that in ruling upon a motion for directed verdict, the evidence and inferences to be drawn therefrom must be considered in the light most favorable to the party against whom the motion is directed and if the evidence and inferences viewed in that manner are such that reasonable minded persons in the exercise of fair and impartial judgment may reach different conclusions upon the question of fact involved, the motion should be denied and the question submitted to the jury. But it is the province and duty of the court to direct a verdict where the evidence is without dispute or is conflicting but of such a conclusive nature that if a verdict were returned for the plaintiff or defendant, as the case may be, the exercise of sound judicial discretion would require that it be set aside. Young v. Johnson, 10 Cir., 286 F.2d 365; Commercial Standard Insurance Company v. Feaster, 10 Cir., 259 F.2d 210, 212; Brodrick v. Derby, 10 Cir., 236 F.2d 35. We think that this is such a case and the lower court had the clear duty to direct a verdict for appellant.

The undisputed evidence in the case shows that there was a material change in the health of the applicant between the dates of his application and the delivery of the policy. During this time, by his own admission in the claim

---

3. In his letter, Dr. Cox stated:

"This is the first electrocardiogram the applicant has ever had. Being aware of abnormality in the tracing, it was not forwarded to your office immediately. Dr. Bohlman and myself are at a loss to explain such findings since there has never been an acute episode in his history nor any other suspicions of cardiac involvement. As a physician practicing in the same building for the past twenty years, I have never known him to have a sickness which could possibly be interpreted as heart trouble. He has been at work everyday with the exception of periodic vacations. We therefore cannot explain these abnormal findings. The only explanation I have is that the involvement occurred in a silent area producing no symptoms."

for disability benefits, he had suffered a heart attack accompanied by pain in the chest, shoulders and arms. He was hospitalized on two occasions because of this heart condition, stopped smoking, was taking recognized heart medication and was under the care of a heart specialist as well as having had several EKGs taken and interpreted by the heart specialist. He not only did not divulge any of this information to the company, but, by the execution of the health statement, upon delivery of the policy, misrepresented to the company his true state of health.

Reversed and remanded with directions to enter judgment in favor of the defendant-appellant.