Ernest **FAIRCLOTH**, Plaintiff-Appellee,

v.

**LAMB–GRAYS HARBOR COMPANY,
INC.**, a corporation, Defendant-
Appellant.

No. 71–2035.

United States Court of Appeals,
Fifth Circuit.

Aug. 14, 1972.

Rehearing and Rehearing En Banc
Denied Sept. 20, 1972.

James J. Duffy, Jr., John N. Leach, Jr., Mobile, Ala., for defendant-appellant.

M. A. Marsal, I. J. Langford, George W. Finkbohner, Jr., Howell, Johnston, Langford & Finkbohner, by Irvin J. Langford and George W. Finkbohner, Jr., Mobile, Ala., for plaintiff-appellee.

Before GEWIN, COLEMAN and IN-GRAHAM, Circuit Judges.

COLEMAN, Circuit Judge:

January 10, 1968, was a bad day for Ernest Faircloth. On that day, while employed as an electrician at the Mobile Plant of International Paper Company, Mr. Faircloth was severely injured by a roll-wrapping machine which had been manufactured and installed by Lamb-Grays Harbor Company, Incorporated. It was also a bad day for Lamb-Grays because the incident resulted in a judgment, upon a jury verdict, against the corporation for $150,000. Upon briefs and oral argument, we affirm the judgment of the District Court.

I

*The Purchase and Installation of The Roll-Wrapping Machine*

In April, 1966, the defendant, a Washington corporation with headquarters in Hoquiam, Washington, a manufacturer

of machinery used in the manufacturing and processing of paper by paper mills, entered into a sales contract with International Paper Company to sell roll-wrapping machines and systems to wrap rolls of paper off the paper making machines located at International Paper Company's Mobile Plant. Pertinent to our inquiry here, this contract provided:

## "ERECTION AND OPERATION SERVICES

"The quoted prices do not include any assembly and erection services nor any inspection, testing, operation or instruction services unless otherwise specified.

"At the Purchaser's request and at a rate of *Seventy-Five Dollars* per eight-hour day, exclusive of holiday work and overtime, plus expenses, *Seller will furnish a competent person to superintend the assembly and erection of the equipment covered by this proposal.*

"At the Purchaser's request, and at a rate of *One Hundred Dollars* per eight-hour day, exclusive of holiday work and overtime, plus expenses, *Seller will furnish a competent engineer to superintend inspection, testing and operation of the equipment covered by this proposal and instruction of the Purchaser's employees in its operation and maintenance.*

"If the Purchaser requests the person or engineer to work holidays or overtime and the person or engineer agrees to work the additional hours, the Purchaser will pay for the additional hours worked at the Seller's prevailing overtime rate.

"Payments for the above services shall be made to the Seller monthly, shall include all time said person or engineer is absent from the Seller's plant on the Purchaser's business and shall include all travelling and living expenses." [Emphasis added].

According to Addendum No. 9 to the contract between the defendant and International Paper Company, the total quoted cost of the machinery was to be $622,730.

Pursuant to the pertinent provisions of the contract previously mentioned, the defendant dispatched George Herigstad, Dan Rudesill, and J. R. Wiren to the Mobile Plant of International Paper Company. Their responsibilities included supervising the installation of Lamb-Grays machines and systems by the employees of International Paper Company. Importantly, it was the responsibility of J. R. Wiren as Field Service Representative for the defendant to instruct the employees of International Paper Company in the proper operation, use, and maintenance of the roll-wrapping machines, conveyor belts, and accessories thus to be installed. The substance of these instructions included on-the-job training of the machine operators relative to machine purpose, function and limitations; machine hazards, safety devices and safe-working habits; and on-the-job training of maintenance personnel, including electrical maintenance workers, on machine purpose, function and limitations, safety devices, and safe-working habits.

The erection of the roll-wrapping machine and system began in August, 1967. On the arrival of Mr. Wiren in September, the installation of the equipment was being done on a twenty-four hour basis by the personnel and contractor of International Paper Company under the supervision of another representative of the defendant. During each day thereafter, Mr. Wiren and the other representative of the defendant were present to supervise the installation of the equipment on a rotating basis of twelve hours [eight in the morning until eight at night and eight at night until eight in the morning]. Mr. Wiren's time was divided so that at one time or another he was present on all shifts and available to the various crews on the shifts to supervise and instruct them on the installation and operation of the roll-wrapping machines and systems.

Mr. Wiren testified that he reviewed the electrical switches and their compo-

nents with the electricians. This included the function of the pushbuttons, valves, manual overrides which would allow the manual operation of the system in the absence of normal electrical operation, and all other facets associated therewith.

Furthermore, Mr. Wiren testified that there was very little chance that a man could be injured by a roll of paper while operating the manual overrides—an alternate method of operating the cushion roll stops and clearing machine jam-ups.

"Q. If any electrical operator were operating the manual overrides switch on this equipment when a roll was sitting on the cushion stop, this cushion stop would come up, but would a roll on the cushion stop roll over the man operating the manual override?

"A. Absolutely not.

"Q. And why is that?

"A. Because the manual overrides are located on the side of the machine.

"Q. I see. And what is the purpose of their being on the far side of the machine?

"A. So the equipment can be operated manually without getting into the deck switches that are on the machine."

At the trial, Mr. Wiren could not definitely recall instructing Mr. Faircloth in the operation of the manual overrides. Previously, in a deposition, he had testified:

"Let me phrase it this way, I did instruct employees of International Paper Company that if they go into a situation where they were required to operate various devices simulating a roll that the safest method, and this is the method I use in checking out machines, is to disconnect—that is to say, open a valve disconnect switch in the main control panel and then operate the manual override on the solenoid valve. In so doing this—in so doing this prevents the electrical operation of solenoid valves so they will respond to any signals from a preceding station.

\* \* \* \* \* \*

"I can not say that I definitely did with Faircloth."

By October 10, 1967, the roll-wrapping machine and system for lines one through four at International Paper Company commenced operation. Construction on the roll-wrapping machine and system for lines five and six began November 1, 1967, and rolls of paper began coming through this system on December 29, 1967.

The roll-wrapping machine and system was designed for fully automatic operation. The important steps in the process of producing a roll of paper, ready for shipment, may be set forth as follows:

FIRST STEP. A roll of paper is made.

SECOND STEP. The roll of paper is moved automatically to the roll-wrapping machine where the roll is to be wrapped in heavier paper for shipment.

THIRD STEP. When the roll of paper reaches the roll-wrapping machine, it is automatically centered so that it can go through the machine directly in the center thereof and thus actuate several automatic switches which are located in the machine itself and which are intended to be activated by the roll as it goes through the remaining steps of the assembly line process.

FOURTH STEP. The paper is wrapped in heavier paper for shipment.

FIFTH STEP. At the header press, a head is put on the roll. A head is a circular piece of paper which is placed on the ends of each roll.

SIXTH STEP. The roll of paper is labeled and automatically moved onto a deck or table in order to be moved downstream from the header press toward a conveyor belt onto which the roll is then placed and moved to other areas of International Paper Company's Plant. This deck or table, which in operation accommodates more than one roll at a

time, is slanted or tilted so that the rolls of paper moving from the header press to the Arm Lowerator will roll of their own weight and gravity. Between the header press and the Arm Lowerator, a series of cushion roll stops are built into the deck or table. They stop (and hold) the rolls of paper as they are discharged from the header press to come down the deck or table to the Arm Lowerator and thus onto the conveyor belt.

When the roll of paper is discharged from the header press onto the deck or table, the nearest cushion roll stop is in an *up* position.

Once the roll of paper is on the slanting deck, it approaches the nearest roll stop, actuating (as it rolls) a switch located in the deck signalling the cushion roll stop to cushion the oncoming roll of paper.

The cushion roll stop retracts to an intermediate position where the roll of paper is held *momentarily* and thereafter discharged to the Arm Lowerator. The cushion roll stop fully retracts, flush with the surface of the deck. When fully retracted, a small gap is left on each side of the retracted cushion roll stop.

As the roll of paper leaves the cushion roll stop and approaches the Arm Lowerator, the roll actuates another deck-type automatic switch known as the Primary Arm Lowerator Entering Switch (P.A.L.E.S.). The P.A.L.E.S. is located in the center of the deck of the roll-wrapping machine so that a roll of paper of any size, when passing over the switch, will actuate it.

When the roll of paper passes over and actuates the P.A.L.E.S., this signals the cushion roll stop member of the Arm Lowerator to slowly retract to cushion the oncoming roll of paper and simultaneously signals the cushion roll stop nearest the header press to fully extend in preparation for accepting the next roll of paper discharged from the header press.

When and if the Arm Lowerator is empty and ready to accept a roll of paper, the cushion roll stop of the Arm Lowerator will fully retract and allow the roll it was holding to come to rest in the V-shaped Arm Lowerator.

On receipt of the roll of paper, the Arm Lowerator will lower the roll to the conveyor belt.

As the roll is lowered onto the conveyor belt, a signal is sent to the cushion roll stop nearest the header press to fully retract and allow another roll of paper to travel toward the Arm Lowerator.

When the roll of paper released by the cushion roll stop passes over the P.A.L.E.S., the cushion roll stop member of the Arm Lowerator again assumes an extended position and readies itself to hold such roll until the Arm Lowerator is ready to accept another roll.

This automatic process is repeated over and over.

During the first ten days of operations, the roll-wrapping system on lines five and six continually had jam-ups. At least two rolls of paper would come together between the two cushion roll stops and on the partially lowered Arm Lowerator. Apparently these jam-ups occurred as the result of a deck plate being located too near a switch in the conveyor belt system which affected the operation of the cushion roll stop located at the beginning of the conveyor belt system. It was the function of this cushion roll stop to cushion rolls of paper leaving the Arm Lowerator and coming onto the conveyor belt system. According to the testimony of an employee of International Paper Company, when anyone walked on the deck plate, the cushion roll stop located at the beginning of the conveyor belt system would "kick back toward the lowerator" and jab a roll of paper against the lowerator.

"Q. Now are you familiar with the —a switch where a cover was cut off?

"A. There was a switch on the scale platform with a piece of metal over it. I was—I am familiar with that switch.

＊　　＊　　＊　　＊　　＊　　＊

"Q. And what would happen in relation to that switch when people would walk in that general area?

"A. Well, we had walked out on it and others had passed there at certain times and that cushion roll would kick back if it was laying over that way.

"Q. You mean by walking on the floor this cushion roll here would jump back?

"A. Would kick back toward the lowerator.

\* \* \* \* \* \*

"Q. All right, sir. Just by walking in the general area?

"A. Well, if you walked on the plate it would throw the switch.

"Q. Oh, the plate was over a switch?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. And what would happen with the roll of paper, Mr. Kearley, with that arm kicked back?

"A. It would jam the paper.

"Q. It would jam up against the lowerator?

"A. Yes sir."

With the cushion roll stop at the beginning of the conveyor belt system fully extended as a result of the pressure by the deck plate on the switch in the conveyor belt system, a signal would be sent to the Arm Lowerator that the position of the cushion roll stop was empty and ready to accept another roll of paper from the Arm Lowerator. The Arm Lowerator would then begin to lower. As a result of the roll of paper having been kicked to a position underneath the Arm Lowerator, the Arm Lowerator would jam against the roll of paper located beneath it and would be unable to continue its process of lowering the roll of paper it held onto the conveyor belt. In the meantime, this interrupted attempt by the Arm Lowerator to lower a roll of paper onto the conveyor belt would signal the cushion roll stop nearest the header press to fully retract and allow another roll of paper to travel toward the Arm Lowerator. As a result, the released roll of paper travelling toward the Arm Lowerator would roll down the tilted or slanted deck and into the roll of paper resting in the partially lowered V-shaped Arm Lowerator.

The deck plate responsible for the tripping of the switch in the conveyor system and thereafter causing the jam-up in the operation of the roll-wrapping system was installed by employees of International Paper Company, but under the supervision of the defendant's representatives, pursuant to the contract already described.

To clear the jam-ups on the roll-wrapping system the employees of International Paper Company utilized a customary procedure described in the testimony of Raymond Thorpe, Harry V. Malone, and Charles L. James.

At the time of plaintiff's accident Raymond Thorpe had been an employee of International Paper Company for five years and was assigned to work behind the operator of the header press. As to how the jam-ups on the defendant's roll-wrapping machine and system were freed prior to the plaintiff's injuries he testified as follows:

"Q. What did you see as to how these jam-ups would be freed before Mr. Faircloth was hurt? What did you observe in the freeing of the jam-up and what did you do or what did you see being done to free these jam-ups?

"A. Well, we would always back your rolls up and start the motor again.

"Q. How would you back them up, please, sir?

"A. Shove them.

"Q. Now after you would roll these rolls back, Mr. Thorpe, what would you do in relation to these switches?

"A. Well, we would mash them and get the system operating again.

"Q. You would mash the switch?

"A. Right.

"Q. How would you mash these switches?

"A. Well, with our hand.

"Q. With your hand?

"A. Right.

"Q. And would you have to reach in and mash them like that?

"A. Well, you would have to reach in if there was a roll there.

\* \* \* \* \*

"Q. Now when you rolled—when you were talking about rolling these rolls back, after you woud roll the rolls back toward the header, would you then reach in on the switch?

"A. Yes, sir.

"Q. And was the usual—was that the way they had been doing before this man got hurt?

"A. We had done it before this, yes, sir."

Mr. Thorpe also testified that he had seen electricians use other buttons on the side of the machine to clear the jam-ups.

Harry V. Malone has been employed by International Paper Company for thirteen years. At the time of the plaintiff's accident, he was employed as an electrical repairman and was assigned to keep the roll-wrapping machine and system operating in a proper procedure.

"Q. What would you do with the rolls of paper that were there in order to try to free the jam?

"A. I would have to move them.

"Q. How would you move them?

"A. Manual strength, roll them back.

"Q. You would roll them back this way?

"A. Right, one of them.

"Q. Yes, sir.

"A. There would usually be two there.

"Q. And you would roll one back?

"A. Yes, sir."

After the rolls of paper were manually moved, Mr. Malone testified that he activated the switch located in the center of the deck to clear up the cycle and return the roll-wrapping machine and system to proper operation.

"Q. All right, sir. Were there any switches on the—for instance, if this switch here was activated by a roll of paper that would roll on it, what other way could you activate that switch?

"A. I always activated the switch itself.

"Q. How?

"A. With my hand.

"Q. How would you get to it to activate it with your hand?

"A. By leaning over the deck plate.

"Q. Now if this paper was the deck plate, please, sir, and this eraser was that switch, you mean you would lean over the deck plate and actuate the switch with your hand just like that?

"A. Yes, sir, I did.

"Q. All right, sir. And had that been the procedure to activate those switches?

"A. That is the way I had freed the jam-ups, yes, sir."

Although Mr. Malone testified that he later learned from going through a thirty foot long schematic drawing of an alternative method of clearing the roll-wrapping machine and system other than activating the switch located in the center of the tilted or slanted deck, he also testified that no one from Lamb-Grays ever instructed him on how to operate the manual override equipment.

"Q. Now did anyone ever instruct you on the operation of any override equipment?

"A. No, sir.

"Q. Did you know anything to do other than reach in on that deck—like I pointed out with the eraser—to activate that switch? ·

"A. No, sir.

"Q. Did you know of any other way?

"A. No, sir. Not at that time, no, sir, I did not.

"Q. What do you mean by not at that time?

"A. Well, later—later in finding —in other words, you could go through your blue print which I am sure you are acquainted with—the print for this equipment—you could go through and find the individual relays in this panel."

Another employee of International Paper Company, Charles James, also testified that the customary method of clearing jam-ups was to push one of the rolls back manually and actuate the deck switch between the two rolls.

## II

### The Injury

On January 10, 1968, while he was working early in the morning as an electrician for International Paper Company at the Mobile Plant, plaintiff was summoned for the third time to the roll-wrapping system on lines five and six for the purpose of taking the necessary action, as an electrician, to clear a jam-up of large paper rolls. In attempting to free the roll-wrapping machine of its jam-up and return the system to its normal operating procedure, plaintiff sustained severe and permanent injuries when his head was caught between two large rolls of paper. At the time of his accident, plaintiff had worked for International Paper Company almost eleven years.

During his testimony, plaintiff substantiated the testimony of the other witnesses as to the previous jam-ups on the roll-wrapping machine and system and as to the customary action taken to clear machine and system of such jam-ups. He further testified:

"Q. Had there been any other procedure used for the clearing of that machine other than by that procedure?

"A. Not to my knowledge."

Despite the frequency of the jam-ups on the roll-wrapping system during the first weeks of its operation, plaintiff testified that he had received no instructions from defendant's representatives as to how to clear the jam-ups.

While it is true plaintiff testified that he knew how to lower the Arm Lowerator by using the manual override switches, he further testified that he was not instructed as to how to operate the cushion roll stops by using such switches and that to his knowledge the only way to control the cushion roll stop was by pushing the switch located in the center of the deck.

"Q. Now did Mr. Waring (Wiren) ever tell you or anyone in your presence or any other mechanic or electrician not to come over here and press this?

"A. No, sir."

Faircloth further testified that when he went up to the machine somebody had already pushed a roll back, leaving it in that position with another on the lowerator. Faircloth activated the P.A.L.E.S. and was immediately injured, the details of which he was unable to remember.

There was testimony that after the accident, the employees were told to use poles and sticks to activate the switches on the deck and not to get between the rolls of paper.

## III

### The Suit Below

The complaint charged Lamb-Grays with negligence in the design of the roll-wrapping machine (and system), with negligence in failing to warn the plaintiff of the deficiencies in the design of machinery, with negligence in failing adequately to instruct the plaintiff in the proper operation thereof, and with negligence in failing adequately to supervise the installation of the system.

Lamb-Grays denied that it had been guilty of negligence or breach of any duty and pleaded contributory negli-

gence on the part of Faircloth "in that plaintiff, at said time and place, knew, or in the exercise of reasonable care and caution should have known that the actuation by him of the electrical switch in question when his body was in a position between the two paper rolls in question would cause one of said rolls to be moved with force against his body and the other of said rolls, and plaintiff nevertheless actuated said switch".

## IV

### *The Appeal*

Appellant relies for reversal on the contention that it was error to allow William H. Cramer to testify as an expert, that the motions for a directed verdict should have been granted, that the motion for judgment notwithstanding the verdict should have been granted, and that the motion for a new trial should not have been denied.

## V

### *The Decision*

### A. The Expert Witness

The admissibility of evidence in the federal courts is a procedural matter, governed by Rule 43(a), Federal Rules of Civil Procedure, Bosse v. Ideco Division of Dresser Industries, Inc., 10 Cir., 1969, 412 F.2d 567, 569. Recently, the Fourth Circuit in Bryant v. Sears, Roebuck & Company, 435 F.2d 953, 955 (1970), held that in determining whether or not a trial court erred in permitting a witness to testify as an expert and therefore to express his opinion, we should look to Rule 43(a).[1]

In Mutual Life Insurance Company of New York v. Bohlman, 328 F.2d 289, 294 (1964), the Tenth Circuit has explained Rule 43(a):

" * * *. The admissibility of evidence in federal court is governed by Rule 43(a), F.R.Civ.P., 28 U.S.C.A., which provides that all evidence shall be admissible which is admissible under: (1) Any federal Statute; (2) any rule of federal equity practice; or (3) the practice of the state where the court is held. See 5 Moore's Federal Practice, § 43.04, pp. 1319–1329. This Court has said that ' * * * Rule 43(a) is a rule of admissibility, not a rule of exclusion' and it ' * * * is designed to favor the reception of all the evidence which properly may be introduced in respect to the point in controversy.' United States v. Featherston, 10 Cir., 325 F.2d 539. It directs us to follow the rule, state or federal, which favors the admission of evidence. N.L.R.B. v. Tex-Tan, Inc., 5 Cir., 318 F.2d 472; Hambrice v. F. W. Woolworth Company, [5 Cir., 290 F.2d 557] supra; Dallas County v. Commercial Union Assurance Co., 5 Cir., 286 F.2d 388. The fact that certain evidence might be inadmissible under a state exclusionary rule or a state statute, such as is involved here, is not controlling in the federal courts. United States v. Featherston, supra; Monarch Insurance Company of Ohio v. Spach, 5 Cir., 281 F.2d 401. ' * * * while state rules of admissibility are controlling in the federal courts, state exclusionary rules are not, and evidence admissible under either of the first two tests must be received even though the state courts would hold otherwise. The rule of Erie R. Co. v. Tompkins, (304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188) limited as

---

1. (a) *Form and Admissibility*. In all trials the testimony of witness shall be taken orally in open court, unless otherwise provided by these rules. All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held. In any case, the statute or rule which favors the reception of the evidence governs and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made. The competency of a witness to testify shall be determined in like manner.

it is to matters affecting substantive rights, does not compel a different result." 5 Moore's Federal Practice, Section 43.04, pp. 1327–1328.

"Generally, under federal law, the qualification of a witness to testify as an expert lies within the sound discretion of the trial court, and the court's determination as to whether or not a witness is qualified will not be reversed unless there has been a clear abuse of discretion", Bryant v. Sears, Roebuck & Company, *supra.*

Speaking for this Court in Crawford v. Worth, 447 F.2d 738, 740–741 (1971), Judge Clark related the federal rule governing our review of trial court rulings as to the admissibility of expert testimony:

"The federal rule regarding review standards of trial court rulings on expert opinion evidence is stringent. ' * * * the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous'. Salem v. United States Lines Co., 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 331, reh. denied, 370 U.S. 965, 82 S.Ct. 1578, 8 L. Ed.2d 834 (1962). In this Circuit's terms: 'The expert qualification of a witness is a question for the trial judge, whose discretion is conclusive unless clearly erroneous as a matter of law'. United States v. 41 Cases, More or Less, 420 F.2d 1126 (5th Cir., 1970)."

Under the Alabama rules it is well established that the competency of a witness to testify as an expert is a matter addressed to the sound discretion of the trial court, and its decision on the evidence going to the witness' competency will not be disturbed on appeal except for palpable abuse, Trans-Southern Life v. Johnson, 1971, 287 Ala. 620, 254 So.2d 321, 324; Independent Life and Accident Insurance Company of Jacksonville, Florida v. Aaron, 1968, 282 Ala. 685, 213 So.2d 847, 850; Lehigh Portland Cement Company v. Dobbins, 1968, 282 Ala. 513, 213 So.2d 246, 249; Thompson v. Magic City Trucking Service, 1965, 275 Ala. 291, 154 So.2d 306, 310; Southern Electric Generating Company v. Howard, 1963, 275 Ala. 498, 156 So.2d 359, 362; Russell v. Relax-A-Cizor Sales, Inc., 1962, 274 Ala. 244, 250, 147 So.2d 279, 284.

We conclude that the rule of this Court and the rule of the courts of Alabama as to appellate review of the admissibility of expert testimony are precisely the same. As we stated in Southern Cement Company, Division of Martin-Marietta Corporation v. Sproul, 378 F.2d 48, 49–50 (1967):

"The trial court has broad discretion in the admission or exclusion of expert evidence, including the qualification of an offered expert, and its decision must be sustained on appeal unless 'clearly erroneous'." Salem v. United States Lines, 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); Santana Marine Service, Inc. v. McHale, supra [5 Cir., 1965, 346 F.2d 147]; Eastern Airlines, Inc. v. American Cyanamid Co., 321 F.2d 683 (5th Cir., 1963).

See also the decision of the Sixth Circuit in McKee v. Aetna Life Insurance Company, 423 F.2d 623, 624 (1970):

"To warrant or permit the use of expert testimony, two conditions must be met; first, the subject matter must be closely related to a particular profession, business or science and not within the common knowledge of the average layman; second, the witness must have such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth."

Quite similarly, the Alabama Supreme Court has recognized that "the courts of this state have long held that to qualify as an expert witness, it must appear that by study, practice, experience, or observation, as to a particular subject matter, the witness has acquired a

knowledge beyond that of ordinary witnesses", Independent Life and Accident Insurance Company of Jacksonville, Florida v. Aaron, *supra*.

■ Mr. William H. Cramer testified that from 1937 to 1957, a period of twenty years, he was employed with Kimberly-Clark, a paper manufacturer, and that he worked in everything that was related to engineering, design of buildings, designs of process, some design of machinery; he was the plant engineer in two mills, *and had been chief engineer* with the responsibility for design, construction and maintenance.

Moreover, Mr. Cramer testified that he spent from two to three hours at the Mobile Plant of International Paper Company inspecting the roll-wrapping system involved in plaintiff's accident, that he made a scale drawing, with overlays, of the section of the roll-wrapping system, and that he spent approximately ten days going over the blueprint of the roll-wrapping system, acquainting himself with the equipment, and qualifying himself as to the workings and operation of this equipment.

We hold that the admission of Mr. Cramer's testimony as an expert, under the foregoing principles, was well within the discretion of the trial court and in this regard no reversible error appears. We reach this conclusion after a careful consideration of our decision in Ward v. Hobart Manufacturing Company, 5 Cir., 450 F.2d 1176 (1971), urged by the appellant as necessitating an opposite result.

## B. The Denial of the Motions for a Directed Verdict and for Judgment Notwithstanding the Verdict

■ It is well established in this Circuit that in diversity cases a federal rather than a state standard should be applied in evaluating the sufficiency of the evidence to give rise to a jury question, Nevels v. Ford Motor Company, 439 F.2d 251, 255 (1971); Pope v. Safeway Stores, Inc., 425 F.2d 1161 (1970);

Boeing Co. v. Shipman, 411 F.2d 365, 368 (1969) (rehearing en banc).

■■ The appropriate federal standard was set forth by this Court in the following language:

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." Boeing Co. v. Shipman, *supra*.

■ Once the facts in the instant case were in, we find that there did exist a substantial conflict in the evidence:

1. Defendant made a contract with plaintiff's employer, wherein it agreed to instruct the employees of International Paper Company in the safe and proper operation and maintenance of the roll-wrapping machine and system

manufactured by defendant and sold to International Paper Company. Also, defendant agreed to supervise the employees of International Paper Company in the installation of the roll-wrapping machine and system.

2. The operation of the manual overrides located on one side of the roll-wrapping system constituted an absolutely safe procedure for clearing jam-ups in the operation of the roll-wrapping system.

3. Defendant's representative, Mr. Wiren, instructed some of the electricians of International Paper Company in the operation of the manual overrides.

4. Plaintiff testified that he was not so instructed.

5. Another electrician of International Paper Company, Mr. Malone, testified that he was not so instructed.

6. Mr. Wiren testified that he could not definitely recall that he instructed plaintiff in the operation and purposes of the manual overrides.

Therefore applying the test of *Boeing,* we believe that the jury could reasonably and fairly have concluded that the defendant was negligent in failing to furnish proper instruction to the plaintiff in the operation and purposes of the manual overrides—a safe procedure for clearing jam-ups on the defendant's roll-wrapping system.

■ In this regard we note that, under the substantive law of Alabama, an employee is entitled to the benefit of contractual provisions made partially for his benefit in a contract between the employer and a third person, Kingsberry Homes Corporation v. Ralston, 1970, 285 Ala. 600, 235 So.2d 371. See, also, Beasley v. MacDonald Engineering Company, 1971, 287 Ala. 189, 249 So.2d 844.

■■ As to the motion for judgment notwithstanding the verdict, the jury was instructed:

"That the burden of proof as to the defendant's special plea of contributory negligence is upon the defendant in this case to reasonably satisfy you from the evidence in this case of the existence of the essential elements of contributory negligence which in cases of this kind are that the plaintiff (1) had knowledge of the existence of the dangerous condition and (2) with appreciation of such danger (3) failed to exercise due care for his own safety by putting himself in the way of such known danger and thereby contributed to the injuries and damages of which the plaintiff complains."

This instruction correctly states the Alabama law of contributory negligence, Southern Minerals Company v. Barrett, 1967, 281 Ala. 76, 199 So.2d 87, 94; State Farm Insurance Company v. Dodd, 1964, 276 Ala. 410, 162 So.2d 621, 628; F. W. Woolworth Company v. Bradbury, 1962, 273 Ala. 392, 140 So.2d 824, 827; Yates v. De Mo, 1960, 270 Ala. 343, 118 So.2d 924, 926; Foster & Creighton Company v. St. Paul Mercury Indemnity Company, 1956, 264 Ala. 581, 589, 88 So.2d 825, 832.

Speaking for this Court in Callaway v. Moseley, 131 F.2d 414, 415 (1942), Judge Hutcheson concluded that:

"It is the law in Alabama, as generally elsewhere, that the burden of proving contributory negligence and that it proximately caused the injury *is on the defendant,* [emphasis added] and that unless the evidence is such that reasonable minds could draw but one conclusion from it, the question of whether a plaintiff is guilty of contributory negligence barring recovery is a question for the jury."

"Unless the evidence of contributory negligence is entirely free of doubt or adverse inference, the question must be submitted to the jury", Yates v. De Mo, supra, citing Alabama Great Southern R. Co. v. Bishop, 265 Ala. 118, 89 So.2d 738, 64 A.L.R.2d 1190.

■ We are convinced that the issue of plaintiff's contributory negligence was one about which reasonable men could differ. Therefore, the District

Court correctly submitted the issue to the jury. We believe the jury could have reasonably and fairly concluded from the evidence in the record that plaintiff was unaware of an alternate method of manually operating and clearing the roll-wrapping system of a jam-up of paper rolls. While plaintiff testified that he knew how to lower the Arm Lowerator by using the manual override switches, he further testified that he was not instructed as to how to operate the cushion roll stops by using the manual override switches, that to his knowledge the only way to control the cushion roll stop was by pushing the P.A.L.E.S. located in the center of the deck.

On the occasion of his accident, plaintiff sought to raise the cushion roll stop nearest the header press to an extended position to hold a roll of paper which had been pushed back, apparently by Mr. Thorpe.

The Alabama courts "have long been committed to the proposition that the plaintiff's appreciation of the danger is, almost always, a question of fact for the determination of the jury", Kingsberry Homes Corporation v. Ralston, *supra.*

C. The Denial of the Motion for a New Trial

 "A motion for a new trial is addressed to the trial Judge's discretion. He may grant a new trial if he thinks he has committed error; and he may grant one (and he alone can) because he thinks the verdict is wrong, though supported by some evidence. The exercise of his discretion is not ordinarily reviewable on appeal, though a failure to exercise discretion, or an abuse of it, may be corrected."

United States v. 1160.96 Acres of Land, etc. Holmes County, Mississippi, 5 Cir., 1970, 432 F.2d 910, 915; Telfair v. Zim Israel Navigation Company, 5 Cir., 1970, 428 F.2d 127, 128, cert. denied, 400 U.S. 1009, 91 S.Ct. 568, 27 L.Ed.2d 622; Marsh v. Illinois Central Railroad Company, 5 Cir., 1949, 175 F.2d 498, 500.

The preceding discussion of the evidence in this case, and the law applicable

thereto, leads us to the conclusion that there was no abuse of discretion in the denial of a new trial.

The judgment of the District Court is Affirmed.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.